UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ANTONIO LOPEZ,

     Plaintiff,

v.                              CASE No. 8:16-CV-79-T-30TGW

STANDARD INSURANCE
CO.,

     Defendant.

_____

## REPORT AND RECOMMENDATION

The plaintiff Antonio Lopez brought this lawsuit alleging that the defendant Standard Insurance Co. violated the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. 1001 et seq., by denying him long term disability benefits under an employer-sponsored disability plan. The defendant has filed a motion for summary judgment, arguing that it did not wrongly deny the plaintiff's claim because benefits were precluded under its policy (Doc. 20). The plaintiff filed a cross-motion for summary judgment, asserting that the defendant improperly denied him benefits (Doc. 23).

The administrative record and the parties' memoranda have been reviewed. Because there is no genuine issue of material fact that the defendant's decision was correct and reasonable, I recommend that the defendant's motion for summary judgment be granted and the plaintiff's cross-motion for summary judgment be denied.

I.

The plaintiff worked for Palm Harbor Homes, Inc., from May 14, 2003, through September 27, 2005, as a sheetrock applicator (Doc. 1, p. 1, ¶4; Doc. 20, pp. 1, 3). Palm Harbor provides to qualifying employees long term disability benefits (AR 1-35).[1]   As pertinent here, defendant Standard Insurance Company issued to Palm Harbor a Group Long Term Disability Insurance Policy (the policy) (see AR 7-35).   According to the policy, an employee is disabled if he meets the definition of either "Own Occupation Definition of Disability" or "Any Occupation Definition of Disability" (AR 16).   Under the policy, own occupation disability is defined as (id.):

---

[1] The defendant filed the administrative record in this case on a CD.  The defendant also provided a courtesy copy of the administrative record. Citations to "AR" refer to pages contained in the administrative record.  Citations to the parties' memoranda correspond to the page numbers in CM/ECF.

During the Benefit Waiting Period and the Own Occupation Period you are required to be Disabled only from your Own Occupation.

You are disabled from your Own Occupation if, as a result of Physical Disease, Injury, Pregnancy or Mental Disorder:

1.   You are unable to perform with reasonable continuity the Material Duties of your Own Occupation; and

2.   You suffer a loss of at least 20% in your Indexed Predisability Earnings when working in your Own Occupation.

The policy defines a disability under any occupation as (AR 17):

During the Any Occupation Period you are required to be Disabled from all occupations.

You are Disabled from all occupations if, as a result of Physical Disease, Injury, Pregnancy or Mental Disorder, you are unable to perform with reasonable continuity the Material Duties of Any Occupation.

Any Occupation means any occupation or employment which you are able to perform, whether due to education, training, or experience, which is available at one or more locations in the national economy and in which you can be expected to earn at least 60% of your Indexed Predisability Earnings within twelve months following your return to work, regardless of

3

> whether you are working in that or any other occupation.

Further, the policy provides that Long Term Disability ("LTD") benefits will end automatically on (AR 19):

> 1. The date you are no longer Disabled....
>
> ...
>
> 5. The date you fail to provide proof of continued Disability and entitlement to LTD Benefits.

In order to qualify for LTD benefits, an employee must be under the care of a physician. Thus, the policy states under the Limitations section (AR 27):

> A. Care Of A Physician
>
> You must be under the ongoing care of a Physician in the appropriate speciality as determined by us during the Benefit Waiting Period. No LTD Benefits will be paid for any period of Disability when you are not under the ongoing care of a Physician in the appropriate speciality as determined by us.

The policy also provides for the Allocation of Authority (AR 30):

> Except for those functions which the Group Policy specifically reserves to the Policyholder or Employer, we have full and exclusive authority to control and manage the Group Policy, to administer claims, and to interpret the Group Policy and resolve all questions arising in the administration, interpretation, and application of the Group Policy.

Our authority includes, but is not limited to:

> 1. The right to resolve all matters when a review has been requested;
>
> ...
>
> 3. The right to determine:
>
>> a. Eligibility for insurance;
>>
>> b. Entitlement to benefits;
>>
>> c. The amount of benefits payable; and
>>
>> d. The sufficiency and the amount of information we may reasonably require to determine a., b., or c., above.

Subject to the review procedures of the Group Policy, any decision we make in the exercise of our authority is conclusive and binding.

To summarize briefly, the defendant granted the plaintiff short-term disability benefits from October 11, 2005, until November 21, 2005. Then, the defendant approved long term disability benefits for the plaintiff until December 25, 2007, based on him being disabled from his occupation. Thereafter, the defendant denied his request for long term disability benefits based on the plaintiff not being disabled from any occupation.

On September 26, 2005, the plaintiff stopped working due to groin pain and cramping (Doc. 20, pp. 1, 7). On November 22, 2005, the plaintiff returned to work, but was terminated the next day on November 23, 2005 (id., p. 7).[2]

The plaintiff, almost a year later, on October 13, 2006, completed a Palm Harbor Homes Long Term Disability Benefits Employee's Statement (AR 244-246).[3] The plaintiff indicated on the form that he was unable to work at his occupation as of September 26, 2005, due to "[f]ull groin[] pain and cramps" (AR 244). The plaintiff also stated he had "pain at walking, [b]ending, standing, sleeping [and] s[i]tting" (id.). The plaintiff explained his injuries were epididymitis in his groin and dislocated discs in his spine due to "[excessive] [h]eavy lifting [excessive] [h]eavy pushing and [b]ending. No rest" (AR 245). The plaintiff indicated he was injured at "[a]round 3:00 p.m. on Jun - 1 - 2005" (id.).

---

[2]The defendant states that the plaintiff was terminated "due to an alleged fraudulent [Workers' Compensation] claim" (Doc. 20, p. 7).

[3]The plaintiff indicated that he had a college degree in Aviation Mechanics, training in real estate, accounting, and as a notary public (AR 246). The plaintiff also previously worked as a front desk clerk, adviser, manager, and as a salesman (id.).

The administrative record in this case is lengthy. However, it is noted that the plaintiff was treated by various doctors for numerous medical conditions and the administrative record includes medical documentation that is not relevant for the pertinent time period in question. In particular, medical records from years after the plaintiff's disability benefits ended on December 25, 2007, have no bearing in the defendant's determination whether he was entitled to LTD benefits based on a disability from the any occupation definition under the policy. Thus, those records have not been summarized.

The pertinent medical information is as follows. A Certification of Health Care Provider dated October 12, 2005, was completed by an unknown health care provider (AR 901-902).[4] It requested Family Medical Leave for the plaintiff because of "pain at the groin area preventing him from lifting weight" (AR 901).[5] The form indicated that the plaintiff's condition began on September 26, 2005, and was expected to last three weeks (id.). It stated that the plaintiff was taking pain medication, unable to perform the

---

[4]An illegible signature appears on the form (see AR 902).

[5]In its memorandum, the defendant indicates that the form states "pain at the spine area" (Doc. 20, p. 3) but, the writing appears to say "groin" and not "spine" (see AR 901).

"essential functions" of his job and he could not "perform work of any kind" (AR 902).

On October 16, 2005, Dr. Nelson M. Pichardo, plaintiff's treating physician, wrote a prescription note that stated "[p]lease excuse Mr. Lopez from work until 10/24/05 due to health issues" (AR 909). Dr. Pichardo continued to treat the plaintiff in 2005 through 2006. Treatment notes ranging from November 2005 through January 2006 indicate that the plaintiff complained about back and testicular pain (see AR 910-914). Dr. Pichardo opined the plaintiff had epididymitis, diabetes, back pain, lumbalgo and acute prostatitis (AR 910, 911).

On October 19, 2005, another treating physician, Dr. Zaw Min, completed a Certificate to return to work/school that explained the plaintiff could not work until October 27, 2005, was unable to perform heavy lifting over twenty pounds, and required a fifteen minute break every two hours (AR 903).

Other medical records from this time period are as follows. The plaintiff was treated in September 2005 by Dr. Halide Kattan (AR 1132). Dr.

Kattan indicated that the plaintiff was out of his medication and, therefore, his diabetes was not being controlled (id.).

The plaintiff was evaluated by Dr. Mark G. Bandyk, a urologic oncologist, and Dr. James W. Jakub ("Dr. Jakub"), a surgical oncologist, for the testicular pain (see AR 917, 918, 920). On October 10, 2005, Dr. Bandyk treated the plaintiff with antibiotics for a cyst and indicated that "[t]here is a right epididymal cyst, but no evidence of hernia or varicocele" (AR 927). Dr. Bandyk noted that the plaintiff had a scrotal ultrasound on September 30, 2005, that "found bilateral normal testes with no masses, cysts or calcification" (id.). According to Dr. Bandyk, on November 2, 2005, the plaintiff had another ultrasound of his scrotum, and the results were essentially normal without evidence of a hernia (AR 918, see also AR 924 scrotal ultrasound). Dr. Bandyk noted, however, that "[t]he [plaintiff] should have restricted activities until his problem is clarified" (AR 923). On a note dated November 21, 2005, Dr. Bandyk indicated that a CT scan demonstrated that there were no abnormalities in the abdomen or pelvis and no inguinal hernias (AR 918). Dr. Bandyk explained the plaintiff (id.):

> ...[has] genital and groin pain of unclear etiology.
> Clinical genital examination plus 2 ultrasounds

found no testicular masses or acute problems. The patient has seen by Dr. Jakub for presence of a hernia, and there appears to be no clinical hernia.

I explained these results to the patient and recommend over-the-counter analgesic for musculoskeletal pain or also see a pain consultant. All questions were answered. With the patient's current examination and recent test findings, I believe the patient can return to work.

Dr. Jakub, on November 21, 2005, also explained that the ultrasound showed the plaintiff had "normal testicles bilaterally" and that the CT scan of his abdomen and pelvis "was essentially negative with no pathology noted" (AR 917). Dr. Jakub noted that the plaintiff claimed that "his testicular pain remained severe and has actually worsened... the pain is sometimes unbearable, sometimes even difficult to sit" (id.). However, Dr. Jakub explained that he was "unclear on the etiology of this continued pain" and "have found no radiographic evidence to identify his pain" (id.).

The plaintiff also had tests done regarding his back pain. On November 28, 2005, the plaintiff had an MRI of his lumbar spine (AR 1524). The MRI indicated that that there was "[n]o abnormal vertebral body signal with no significant desiccation of the intervertebral discs" (id.). The impression of the MRI was "[n]o significant canal stenosis with patent neural

foramen" (id.).  A radiologist, Richard A. Leverone, DC, DACBR, prepared

a report on December 8, 2005, regarding an x-ray of the plaintiff's spine that

included four views of that area (AR 1525).  The report noted that there was

"[m]inimal spondylosis mainly in the upper thoracic segments and very

minimally in the lumbar spine" and there was "[n]o recent fracture throughout

the study" (id.).  Further, "[c]ystic changes are noted in the neck of the right

femur that may relate to a benign bone cyst or possibly synovial pits...[there]

is a tiny opacity overlying the right ilium...[t]his is of indeterminate origin,

but appears to be a benign entity" (id.).

      During this time, a Workers' Compensation form titled Notice

of Action/Change, dated December 1, 2005, stated "[a]fter an ultra sound and

a cat scan, the 3 Dr.'s could not find anything wrong with the claimant.

Therefore, any continuing complaints will have to be considered personal in

nature and not related to his employment" (AR 977).

      The plaintiff was treated by chiropractors Dr. Richard W.

Merritt, and Dr. Rodney W. Merritt (see e.g., AR 1175, 1185, 1546).

According to treatment notes, Dr. Richard Merritt first saw the plaintiff for

an initial chiropractic visitation on December 2, 2005 (AR 1546).  At this

visit, Dr. Richard Merritt assessed the plaintiff as having chronic vertebrogenic pain and somatic dysfunction and chronic spinal motion injury (id.). Dr. Richard Merritt also stated that the plaintiff "is presently temporarily, totally disabled with all activities of daily living to be below soreness threshold" (id.). According to a Consultation Questionnaire completed by Dr. Rodney Merritt on December 2, 2005, the plaintiff reported neck pain, lower back pain and swollen and testicular pain (AR 1180). The plaintiff indicated that his problems began in June 2005 (id.).[6]

A few days later, on December 5, 2005, Dr. Richard Merritt opined the plaintiff had subluxation, lumbar vertebra, lumbar neuritis or radiculitis, subluxation, cervical vertebra unspecified, and cervical facet syndrome (AR 1548). The doctor noted that the plaintiff had cervical extensions with pain (AR 1547). Dr. Richard Merritt also opined that the plaintiff "is capable of safely performing sedentary activities of daily living, but is not employable at this time" (AR 1548). The doctor further indicated that the plaintiff "may b[e] able to safely perform sedentary duties at best" (AR 1549). Notably, on December 20, 2005, the plaintiff indicated that he

---

[6]In October 2006, it was marked that the plaintiff had severe and constant headaches with severe and frequent neck pain (AR 1208).

had mowed his lawn over the weekend and on January 6, 2006, the plaintiff reported that he was "walking every day" (AR 1557, 1565).

The plaintiff continued treatment with the chiropractors through 2007 (AR 1546-1707). During these visits, the plaintiff reported various pains including back pain, testicular pain and headaches (see e.g., AR 1546, 1547, 1578, 1587). The doctors' notes consist of routine office visits that often reflect repetitive language in the notes (see id.).

The administrative record also contains various pain questionnaires from December 2005 through December 2006 (AR 1195-1209). According to the forms, the plaintiff indicated that he suffered from headaches (see id.). The plaintiff also stated that, among other things, he had constant and severe neck pain, mid back pain, and low back pain (see e.g., AR 1195,1198,1206,1208).

The plaintiff continued his treatment with his doctors in 2006. For example, on February 24, 2006, Dr. Richard Merritt diagnosed the plaintiff as having subluxation cervical vertebra unspecified, cervicogenic headache, subluxation lumbar vertebra, and lumbar neuritis or radiculitis (AR 1589). Dr. Richard Merritt reported the plaintiff "is presently temporarily,

totally disabled with all activities of daily living to be below soreness threshold" (AR 1589). Dr. Richard Merritt also noted that "[t]he prognosis in this case has currently been objectified as poor" (id.). On May 8, 2006, Dr. Richard Merritt opined the plaintiff had vertebrogenic pain syndrome, spinal enthoespathies, late effect of sprain/strain, and cervicogenic headaches (AR 1611).

Dr. Min stated in progress notes that the plaintiff was being treated for hyperlipidemia (AR 1128). In March 2006, the plaintiff was hospitalized for hyperlipidemia (AR 1750-1752). The following month in April 2006, the plaintiff was hospitalized for chest pain (AR 1760-1764). The plaintiff also complained of testicular pain (AR 1763). An x-ray of the plaintiff's chest on April 2, 2006, indicated that the plaintiff's "lungs are clear of any acute inflammatory infiltrates. The heart, mediastinum and pulmonary vascularity are normal" (AR 1801). The impression of the results was "[n]ormal chest" (id.). The plaintiff had a Cardiovascular Stress Test performed on April 3, 2006, and the result was "negative for the presence of myocardial ischemia" (AR 1806). An Echo Full Study performed on April

4, 2006, demonstrated that the plaintiff had a "[n]ormal left ventricular systolic and diastolic function.  Normal valves" (AR 1803).[7]

During his hospital stay, on April 4, 2006, the plaintiff was examined again by Dr. Bandyk regarding his complaints of testicular pain (AR 1786-1787).  The plaintiff also had a scrotal ultrasound performed and it showed (AR 1802):

> Normal appearing testicles with vascular flow followed by irregular epididymi without evidence of increased vascular flow, somewhat dominant on the right.  Moderate bilateral hydroceles with debris.  Perhaps this pattern represents changes of epididymitis.

Dr. Bandyk opined the plaintiff had "possible right epididymitis" and "[r]ecommended completion of Levaquin treatment course" (AR 1787).  Dr. Bandyk concluded that the plaintiff has "no active testicular problems" and that he "has a history of chronic pelvic and genital pain of unclear etiology" (id.).  The plaintiff was discharged in stable condition (AR 1761, 1762).  The

---

[7]According to the Chiropractic Health Center - S.O.A.P. Notes, dated April 3, 2006, the plaintiff called his chiropractors to inform the office that "he was hospitalized over the week[end] [] with a heart attack" (AR 1600).

.

defendant also indicates that later in the month, on April 28, 2006, the plaintiff went to the hospital for uncontrolled diabetes (Doc. 20, p. 5).[8]

Dr. Richard Merritt prepared a Discharge Report on May 10, 2006 (AR 1493-1495). According to the report, Dr. Merritt indicated that the plaintiff was "dismissed from regular[] scheduled treatment and observation ... as of May 8, 2006[,] because a maximum level of clinical improvement [had] been obtained" (AR 1493). However, Dr. Merritt noted that the plaintiff was "advised to return to our office on an as needed basis for therapeutic treatment" (AR 1494). Dr. Merritt opined that the plaintiff's prognosis was "poor" and that he had cerviogenic headaches, vertebrogenic pain syndrome, late effect of sprain/strain, and spinal enthesopathies (id.). Dr. Merritt concluded that the plaintiff was (id.):

> ...presently capable of safely performing sedentary daily activities which include exerting up to ten pounds of force to lift/push/pull up to one-third of the time and/or negligible amounts frequently; sitting most of the time with brief periods of walking or standing up to one-third of the time. He is incapable of safely working.

---

[8]In October 2006, the plaintiff went to the emergency room for an ear infection (AR 1723, 1744).

Dr. Merritt also opined that the plaintiff's "condition may very well decline" (AR 1495) and that "he may prove to be a more viable candidate for Social Security Disability" (id.). Dr. Merritt stated that "based on the Florida Impairment Guide, [the plaintiff] has sustained a permanent, partial disability conservatively related as six percent of the body as a whole" (id.).[9] The plaintiff continued receiving care from Dr. Richard Merritt and Dr. Rodney Merritt through 2007 (see e.g., AR 951, 963, 967, 1646).

A neurologist, Dr. Fernando L. Miranda on June 23, 2006, conducted a neurological and musculoskeletal exam of the plaintiff (AR 906-907). The plaintiff complained of pain in his neck, lower back, foot and head (AR 906). According to the results of the neurological exam, the plaintiff's gait was "mildly antalgic without footdrop or ataxia" (AR 907). Dr. Miranda indicated that the plaintiff had "no obvious muscle atrophy or fasciculations in any of the extremities" (id.). Dr. Miranda stated (id.):

---

[9]According to Dr. Richard Merritt's notes, on October 13, 2006, the plaintiff had "[a] retrogression [that] has been caused by chronicity of his spinal condition" (AR 1617). The plaintiff complained of low back pain, neck pain, pain in both legs and arms, and a headache (see id.). Dr. Merritt indicated that there were factors complicating the plaintiff's recovery of "Metabolic disorders. Alteration of normal spinal curves. Multiple levels of spinal segmental dysfunction" (see id.). The plaintiff reported the following pain levels of: headache at an eight, arm/hand pain at a seven, mid back pain at an eight, low back pain at a ten, and neck pain at a nine (AR 1617, 1618).

> ... there is tenderness to deep palpation throughout the lumbar spine on the facet and paravertebral musculature. There is sacroiliac joint tenderness, anterior abdominal wall tenderness, and iliotibial band tenderness as well. He is able to heel walk, toe walk, and tandem walk. When asked to move around and get onto the examining table the patient does exhibit quite a bit of pain behavior. There is tenderness in the lower abdominal area. Testicular examination and groin examination did not reveal any hernias, masses, or lesions. There is some tenderness over the cervical spine with diminished range of motion of the cervical spine as well.

Dr. Miranda concluded that the plaintiff has "cervicalgia and does have some testicular pain, possibility of epididymitis or orchialgia" and "[p]elvic pain" (id.). Dr. Miranda suggested the plaintiff have MRIs done of his pelvic and cervical areas, cervical flexion and extension x-rays and to go to physical therapy (id.).

Thereafter, Dr. Ashok G. Reddy began treating the plaintiff on September 8, 2006 (AR 857-860). Dr. Reddy's handwritten notes are difficult to read, however, he routinely assessed the plaintiff as having low back pain (see e.g., AR 840, 847, 850, 851).

On September 26, 2006, Dr. Min wrote a note that "[b]ecause of his condition [the plaintiff] needs to do light work with no lifting of any kind until further notice" (AR 900).[10]

On October 13, 2006, Dr. Richard Merritt completed a Palm Harbor Homes Long Term Disability Benefits Attending Physician's Statement (AR 979-980). According to the form, the plaintiff's primary disabling condition was "[v]ertebrogenic [p]ain [s]yndrome" with a secondary diagnosis of "[s]pinal [e]nthesopathies" (AR 979). Dr. Merritt also diagnosed the plaintiff as having "[l]ate-[e]ffect of [s]prain/[s]train," "[c]ervicogenic [h]eadache", and indicated that his diabetes complicated his treatment (AR 979, 980). The plaintiff had symptoms of neck pain, headaches, and testicular pain (AR 979). According to Dr. Merritt he recommended that the plaintiff stop working on September 26, 2005 (id.). However, Dr. Merritt indicated on the form that he began treating the plaintiff a couple months later on December 2, 2005 (AR 979). Dr. Merritt also opined that the plaintiff's "limitations [were] permanent" and his "limited physical capacity preclud[ed]

---

[10]The defendant indicates in its memorandum that Dr. Reddy wrote the note in September 2006 (Doc. 20, p. 6). However, according to the top of the note it states "Bay Care Medical Center Zaw Min, M.D." (AR 900).

him from safely working" (AR 980). Dr. Merritt also marked on the form that the plaintiff's "condition [is] expected to improve" with an "anticipated date: 5/2007" (AR 980).

The administrative record contains further treatment notes from Dr. Richard Merritt and Dr. Rodney Merritt from October 2006 through February 2007 (AR 944-976). The treatment notes consist mainly of the doctors' chiropractic adjustments of the plaintiff including electrical stimulation and massages (see id.). Dr. Richard Merritt noted on December 18, 2006, that the plaintiff "is presently temporarily, totally disabled with all activities of daily living to be below soreness threshold" (AR 959).

The defendant submits that it initially denied the plaintiff's claim "due to lack of proof of loss" (Doc. 20, p. 1). Thus, the defendant in a letter dated November 29, 2006, informed the plaintiff that it was not approving his claim for disability benefits (AR 217). The letter explained that it was "unclear what [the plaintiff's] treatment plan has been from the time [he] ceased work (September 26, 2005) to [the] present" (AR 218). Moreover, the letter explained that the plaintiff's treatment with Dr. Merritt commenced on December 2, 2005, which was months after September 26, 2005, and

consequently, there was no documentation of him being treated prior to that date (id.).   Standard also had insufficient information concerning the plaintiff's limitations and restrictions showing that he was unable to perform his own occupation (AR 219).

On December 4, 2006, the plaintiff was evaluated for Workers' Compensation at the Orlando Orthopaedic Center (Doc. 20, p. 8; AR 933-939).[11]  The defendant explains that it was not provided with this evaluation because it was probably part of the plaintiff's Workers' Compensation claim (Doc. 20, p. 8).  According to the musculoskeletal/neurological exam, the plaintiff had "a normal gait" and "[t]here is full painless range of motion of both upper extremities" (AR 935).  An exam of the cervical spine revealed there was no pain and spasms in the cervical spine, the right and left paracervical, and the right and left trapezius (AR 936).  The plaintiff's exam

---

[11]In the record, there is a Pain Intensity and Frequency Form and Functional Rating Index that was completed by the plaintiff on December 18, 2006 (AR 941-942). According to the Pain Intensity and Frequency Form, the plaintiff had a headache of a pain of six on a scale between zero and ten, which indicates moderate pain (AR 941). The plaintiff rated his neck and low back pain as an eight, which indicates severe pain (id.). The plaintiff rated the frequency of his headaches and neck pain as 80 percent, which indicates frequent pain (id.). The plaintiff rated his mid back pain as 80 and 90 percent, with 80 being frequent and 90 meaning in constant pain (id.). The plaintiff rated his low back pain as being 100 percent, meaning in constant pain (id.). On the Functional Rating Index, on a scale between 0 to 4, the plaintiff listed lifting, walking and standing as a 4, meaning he has an increase of pain when doing those activities (AR 942). He also circled a 4 for work, meaning he could not work (id.).

of his lumbar spine showed no spasms (AR 937). The plaintiff had pain in the right and left paraspinals (id.). However, the plaintiff did not have pain in the lumbar spine, right and left sacroiliac, right and left illiolumbar, and right and left sciatic notch (id.). Under the "Impression" section of the report it noted there were "multiple musculoskeletal complaints ... subjective complaints of low back pain with lack of correlated objective findings ... testicular pain" (id.). Under "Recommendations" section it stated (AR 939):

> 1. He has subjective complaints of pain, but objectively I really have nothing to correlate this with. His examination is essentially non-diagnostic. His imaging studies are essentially normal.
> 2. I believe his treatment to this point in time has been adequate; however, there is really no further treatment indicated at this point in time.
> 3. From an orthopedic standpoint he would be at maximum medical improvement and given a 0% impairment rating. Based on his objective findings I would not hold him to any work restrictions.

On December 21, 2006, the plaintiff appealed Standard's decision denying his claim (Doc. 20, p. 8). After the plaintiff appealed Standard's decision, the defendant approved benefits only from the period between October 11, 2005, through November 21, 2005, because the plaintiff had returned to work on November 22, 2005 (id., p. 1).

During 2007, the plaintiff continued to be treated by Dr. Rodney Merritt, Dr. Richard Merritt and Dr. Reddy (see e.g., AR 841, 852, 1163, 1210 (Richard)).[12] Dr. Reddy's treatment notes consist of marks on a form with mainly illegible handwriting (see e.g., AR 841, 844, 849). Dr. Reddy indicated that the plaintiff had diabetes, back pain, and depression (see AR 841, 843, 851).[13] On February 19, 2007, Dr. Reddy completed a Physician's Statement (AR 209). The form is difficult to read, but it lists plaintiff's diagnosis as back pain (id.). Dr. Reddy marked on the form "no" to the question of whether the plaintiff is "able to seek employment" (id.). Dr. Reddy opined that the plaintiff's incapacity would last six months (id.).

A form was completed by an unknown health care provider on June 8, 2007 (AR 1184). The form was marked that the plaintiff's "pain has decreased" and that his "headaches have decreased" (id.). It also stated that the plaintiff's general health was "good," that the plaintiff had "less" pain, and that his improvement was "excellent" (AR 1184). The form was marked

---

[12]The plaintiff began treatment with Dr. Reddy on September 8, 2006 (see AR 857).

[13]Dr. Reddy indicated on June 1, 2007, that the plaintiff had a headache (AR 848). According to a Pain Intensity and Frequency Form the plaintiff completed on August 17, 2007, the plaintiff suffered from severe and constant headaches, severe low back pain, neck pain and mid pack pain (AR 1164).

that the plaintiff received 40 percent of relief (id.). Previously, in April 2007, it was marked that the plaintiff only had ten percent of relief and only "fair" improvement (AR 1186).

On August 23, 2007, the plaintiff went to the emergency room for chest pain (AR 790). The plaintiff had a two view chest x-ray conducted (AR 792). The results indicated that his "heart size and pulmonary vessels [were] normal" and his "lungs [were] clear" (id.). The summary of the findings was "[n]ormal two view chest x-ray" (id.). The plaintiff was released to go home and the nurse noted that the plaintiff "ambulat[ed] without assistance" (id.).

The record includes more treatment notes from Dr. Richard Merritt and Dr. Rodney Merritt for October 2007 through December 2007 (AR 1210-1220). According to the chiropractors' notes, the plaintiff complained of neck pain, pain in both legs, pain in both arms, mid and low back pain, groin pain and headaches (see e.g., AR 1210, 1216). The notes routinely indicate the plaintiff received various treatments including chiropractic adjustments, electrical stimulation and massages (see e.g., AR 1211, 1212, 1220).

The plaintiff's appeal of the defendant's decision continued through the years. Thus, on January 17, 2008, Standard in a letter to the plaintiff explained that it was not approving his claim because the records from the plaintiff's treating sources did not support "any treatments for the time period [that the plaintiff] left work in September of 2005" (AR 185). According to a letter dated January 23, 2008, the plaintiff was going to send to Standard a paper from Dr. Reddy that indicated that "he has lifetime restrictions of no work" (AR 184). The next day, Standard in a letter dated January 24, 2008, explained again that it could not find any treating sources that recommended the plaintiff should "stop working as of September 27, 2005" (AR 183).

However, on May 12, 2008, Standard informed the plaintiff by letter that it had received new information that it was reviewing (AR 180). The new information pertained to a medical review prepared by Gerry Goldsmith, R.N., C.P.D.M. (AR 889-890). On May 16, 2008, Goldsmith completed a Nurse File Review (id.). Goldsmith stated she "reviewed the notes submitted by the attorney surrounding the relevant time period and notes during the time in question (cw 9/26/05-12/05)" (AR 889). Her report summarizes the medical record she reviewed but noted that "[t]he majority of

the bulk of the notes are for dates outside the cw and 11 week STD time period" (id.).

Goldsmith indicated that her review of the medical review showed the plaintiff reported to have "severe and worsening groin, testicular pain, onset 6/1/05" (AR 890). Goldsmith noted that "Dr. Pichardo continued to treat [plaintiff's] pain ... additional pain meds and Medrol Dose pack added. Notes 1/06 show there is no change in his pain symptoms" (id.). Based on her review, Goldsmith concluded that it was reasonable from September 26, 2005, through the eleven week time period for the plaintiff to have a twenty pound lifting restriction limitation "with [the] ability to change positions every 2 [hours] as needed" (id.).

Standard obtained a report regarding the plaintiff's occupation. On June 4, 2008, Anne VanDeBrake, V.C.M., prepared an occupational analysis (AR 312-313). According to the report, the plaintiff's job duty was that of a sheetrock applicator (id.). VanDeBrake's report indicated that the occupation of a sheetrock applicator was medium level work consisting of exerting force: occasionally twenty to fifty pounds, frequently ten to twenty-five pounds, and constantly up to ten pounds (AR 312).

Standard also acquired additional information pertaining to the plaintiff's medical condition (Doc. 20, p. 10). Thus, Standard received a medical review from Dr. Hans Carlson (AR 879-881). Dr. Carlson completed a report dated June 27, 2008, regarding a review of the plaintiff's medical records. Dr. Carlson summarized the plaintiff's medical history as having "chronic testicular pain ... low back pain" and, that "[t]he documented notes do not provide any findings consistent with lumbosacral radiculopathy" (AR 880). For the question of whether the plaintiff would be precluded from medium level work from September 26, 2005, Dr. Carlson answered, due to the plaintiff's low back pain that it was "reasonable to anticipate that a 44-year-old individual with chronic low back pain would be precluded from medium-level work" (id.). Dr. Carlson further stated that he "anticipat[ed] [the plaintiff] would be capable of performing up to and including light-level work on a full time basis" (id.). Thus, Dr. Carlson opined that "the [plaintiff] would be precluded from medium-level work with respect to the lumbar spine condition" (id.). As for the duration of the plaintiff's condition, Dr. Carlson indicated that the records he reviewed were "somewhat dated", that "more updated records would be useful" but, that the plaintiff's "limitations are likely permanent" (id.).

As previously indicated, Standard informed the plaintiff by letter dated July 9, 2008, that it was approving the plaintiff's short term disability claim until November 21, 2005 (AR 177). Standard advised the plaintiff that it was closing his claim after that date because he was terminated from his employment on November 23, 2005 (id.).[14]

Thereafter, on August 27, 2008, plaintiff's treating physician Dr. Reddy completed a form regarding the plaintiff which is difficult to read (AR 896). According to the form, the plaintiff has back pain and is unable to lift greater than twenty pounds (id.). Dr. Reddy wrote that the plaintiff's condition will last a "lifetime" (id.).

On September 23, 2008, Dr. Reginald Allen informed Dr. Reddy by letter, that he was treating the plaintiff for hematospermia (AR 877). Dr. Allen also indicated he discussed with the plaintiff doing an ultrasound of his prostate and that he was to see the plaintiff in several weeks (id.).

During 2009, the plaintiff continued receiving care from Dr. Reddy, Dr. Rodney Merritt, and Dr. Richard Merritt. On June 24, 2009, Dr. Allen advised Dr. Reddy in a Urologic Follow-Up Note that he continued to

---

[14] It is noted that in a letter dated December 18, 2008, the plaintiff appealed Standard's decision denying his claim for disability benefits (AR 176).

treat the plaintiff for an intermittent persistent hematospermia (AR 874).  Dr. Allen informed Dr. Reddy that the plaintiff was being scheduled for a CT scan of his abdomen and pelvis (id.).

Thereafter, on June 26, 2009, the plaintiff had a CT scan of his pelvis and abdomen (AR 872-873).   According to the Radiological Interpretation of the CT scan, the scan was essentially normal (AR 873). There was no abnormality in the areas of the plaintiff's renal, ureteral, and urinary bladder (id.).  There was "moderate generalized fatty infiltration of the liver" and the right scrotum had a "hydrocele" (id.).  It was recommended that the plaintiff have a scrotal sonogram (id.).  The report indicated that there were "no other significant findings" (id.).  Thereafter, Dr. Allen wrote another Urologic Follow-Up Note dated July 15, 2009, to Dr. Reddy advising him that the plaintiff complained of an inguinal hernia and, therefore, he was recommending an evaluation by a general surgeon (AR 871).

The plaintiff's appeal of the defendant's decision continued.  It is noted that on March 2, 2012, plaintiff's counsel informed the defendant that the plaintiff was approved for Social Security disability benefits starting in July 2009 (AR 155).  On March 25, 2010, a claim specialist for Standard indicated in a memo that the plaintiff had returned to work on November 22,

2005, under light duty restrictions (Doc. 20, p. 11). In a letter dated March 25, 2010, Standard informed the plaintiff that it was reopening his claim for STD benefits (AR 164). Standard also requested on various occasions for the plaintiff to send it information regarding his Workers' Compensation benefits in order to determine the amount of his benefits (see e.g., AR 159, 160, 162).

Thereafter, on July 18, 2013, the plaintiff provided Standard a summary of the Workers' Compensation money that he had received (AR 140). On September 9, 2013, Standard requested that the letter be re-sent because it was difficult to read (AR 110). On May 1, 2014, Standard sent the plaintiff a letter explaining the STD benefits that he was entitled to and that it was considering his long term disability benefits claim (AR 106). After Standard sent letters to the plaintiff and his counsel requesting additional information on his claim, it sent another letter on June 13, 2014, to plaintiff's counsel, explaining it required the additional information (AR 269). It was also extending the time in making a decision on his long term disability claim (id.). The additional information included a list of the plaintiff's medical providers since August 2007 (id.). According to Standard's letter on June 19, 2014, the additional information had been requested and Standard would make a decision once it received all of the necessary information (AR 271).

30

Thereafter on July 9, 2014, Standard sent another letter to plaintiff's counsel informing him that it had not received a response from him regarding its previous letters (AR 272). Standard explained that it needed the requested documentation in order to review the plaintiff's entitlement to LTD benefits (id.). On July 25, 2015, Standard again sent a letter to plaintiff's counsel explaining that it would allow the plaintiff's request for additional time to submit the required documents (AR 275). The letter warned that the plaintiff's claim would be denied if the information was not provided by August 4, 2014 (id.).

On August 4, 2014, Standard sent a letter to plaintiff's counsel informing him that the plaintiff's claim for LTD benefits was denied because it was not provided the requisite documentation for the "Proof of Loss" policy provision (AR 278). The letter explained that the submission of documentation from Dr. Miranda was not sufficient information by itself (AR 279). However, the letter stated that the plaintiff could have this decision reviewed (id.). In a letter dated September 15, 2014, Standard thanked plaintiff's counsel for providing the required information and stated that it was going to review the information (AR 281). On November 25, 2014, Standard in a letter informed plaintiff's counsel that it had received the

requested records and that a physician consultant was reviewing the plaintiff's medical record (AR 287).

Standard had Dr. Carlson prepare a medical review of the plaintiff in order to help it determine the plaintiff's claim for long term disability benefits (AR 523-525). Dr. Carlson prepared a report dated December 23, 2014, in which he reviewed additional medical records pertaining to the plaintiff (AR 523). Based on his review of the medical record, due to the plaintiff's complaints of back pain, Dr. Carlson opined the plaintiff "would remain precluded from medium-level work ... [and] anticipat[ed] that he would be capable of sedentary or light-level work with further limitations and restrictions of no constant bending, stooping, twisting, or squatting activities" (AR 525). With regard to the question of whether the plaintiff would have any limitations or restrictions due to "his foot numbness, diabetes, or cardiac complaints," Dr. Carlson concluded that he "would defer this to an internal medicine physician consultant with respect to the diabetes and cardiac complaints ... [but, he] would anticipate, again, that he would be capable of sedentary or light-level work ... [and regarding his] history of the diabetic neuropathy, [] would be precluded from working at heights or frequent walking on unlevel terrain" (id.).

Standard also obtained a medical review from Dr. Gary Nudell. Dr. Nudell, who is Board Certified in Internal Medicine, completed a Peer Review Report dated January 16, 2015, regarding the plaintiff (AR 511-517). In his report, Dr. Nudell indicated that the plaintiff had stopped working in September 2005 due to back pain (AR 514). Dr. Nudell noted that the plaintiff "has been evaluated for chronic medical conditions including diabetes, coronary artery disease status post stent placement, polyneuropathy, asthma, major depression, hypertension, inguinal hernia, [and] status post fall with rib fracture and pneumothorax" (id.). Dr. Nudell then set forth chronologically the plaintiff's medical conditions starting from November 2005 with his complaints of testicular pain through the end of 2014 (AR 514-515).[15]

Dr. Nudell also indicated that he spoke over the telephone with the plaintiff's treating physician, Dr. Kattan, on January 12, 2015 (AR 513). According to Dr. Nudell's report, Dr. Kattan "outlined the [plaintiff's] history of diabetes with peripheral neuropathy, history of coronary artery disease status post stent times 2 in 2013, asthma, depression, a painful inguinal

---

[15]A list of the records that Dr. Nudell reviewed include records from 2015 (see AR 511).

hernia, and obstructive sleep apnea" (id.).  However, Dr. Nudell noted that Dr. Kattan "was unable to give any specific recommendation regarding restrictions and limitations" but, due to the plaintiff's "multiple complaints and multiple medical conditions that overall may limit functional ability in the workplace" (AR 513-514).  Dr. Nudell subsequently sent Dr. Kattan a letter on January 16, 2015, that summarized their conversation (AR 518).  Dr. Nudell requested Dr. Kattan sign the letter, acknowledging that she was in agreement with the letter (id.).  Apparently, Dr. Kattan did not return the letter to Dr. Nudell (see Doc. 20, p. 13).

Dr. Nudell noted in his report that his opinions were based from "an internal medicine perspective only" (AR 516).  Dr. Nudell opined that the plaintiff's "diabetes and diabetic neuropathy of the feet" would not prevent the plaintiff from working (id.).  Dr. Nudell further determined the plaintiff (id.):

> would be limited to a sedentary type occupation with the ability to use a cane as needed for ambulation.  The [plaintiff] should therefore be capable of sitting for 6-8 hours out of an 8 hour day; ambulating for limited periods of time, up to 15 minutes at a time for 2 hours per day with the use of a cane; he should avoid kneeling, squatting, and balancing; the medical records do not support limitations with fine motor activity of the hands;

> the medical records do not support any cognitive restrictions or limitations based on these conditions. The claimant should be capable of lifting up to 10 pounds of weight frequently, with no restrictions with overhead lifting.

Regarding the plaintiff's coronary artery disease from October 2013 (which is not within the pertinent time period), Dr. Nudell further stated he (id.):

> would ultimately opine that the available records would not preclude the [plaintiff] from functioning in a sedentary based occupation as a result of coronary artery disease, and that the [plaintiff] should be capable of performing all of the above-mentioned functions from a cardiac perspective.

For the question of when the "limitations and restrictions" from the plaintiff's conditions became supported, Dr. Nudell answered that the plaintiff "has a history of chronic diabetes and neuropathy" (AR 517).  Dr. Nudell also explained that he was "unable to determine specifically from the records as to when the claimant's neuropathy began" but, that he "[could] only comment that the claimant's diabetes and neuropathy appear to be a chronic condition, with at least mention of this condition in the records dating back to 2010" (id.).

Thereafter, on January 28, 2015, Valerie Gibson prepared a report for the LTD decision titled Transferable Skills Assessment and Any

Occupation Review (AR 293-307).[16]  Gibson is a vocational case manager

and the purpose of the report was "[t]o assess [the plaintiff's] ability to

perform any occupation given documented functional capacity, work history,

education, training, experience, transferable skills and labor market analysis"

(AR 293).  Gibson concluded that the plaintiff had transferable skills to

perform sedentary work as a customer service representative or information

clerk (AR 299).  Gibson also indicated that the identified jobs met the wage

requirement under the policy (AR 296, 298, 299).

On February 9, 2015, by letter, Standard informed the plaintiff

that it approved his claim for long term disability benefits through the Own

Occupation Period between December 26, 2005, and December 25, 2007

(AR 69-77).[17]  However, Standard explained that it determined the plaintiff

was not disabled under the definition of Any Occupation because it

determined that he could perform sedentary level work after December 25,

2007 (AR 69, 75).  Therefore, Standard was closing his claim after December

---

[16] Gibson signed the report on January 29, 2015 (AR 307).  The report also indicated that the plaintiff has a Bachelor of Science degree in Mechanical Engineering from the University National of Mexico in 1985 (AR 293).

[17] According to the letter, Standard determined the plaintiff was disabled on September 27, 2005, however, LTD benefits become payable after ninety days (AR 69). Therefore, LTD benefits began on December 26, 2005 (id.).

25, 2007, because the medical documentation did not support a claim for disability after that date (AR 69-77).

By a letter dated May 14, 2015, plaintiff's counsel appealed Standard's decision that "he was not disabled past the own occupation period" (AR 66).  The letter stated that the plaintiff had non-exertional impairments of "frequent urination from his diabetes, intermittent blurred vision, and fatigue" and that he has "sleep apnea" (id.).  The  letter also explained the jobs identified by the vocational expert "involve significant and frequent dealing with people and tasks that require more than simple, routine, repetitive activities" and that the plaintiff "would not have been able to do those jobs with these non-exertional symptoms" (id.).  Thereafter, on May 28, 2015, plaintiff's counsel in a telephone conversation informed the defendant that "the issue was not the [plaintiff's] capability of performing the physical demands of [s]edentary strength level work, but his difficulty with focus, concentration and other constitutional complaints" (AR 65).[18]  On the same date, defendant sent plaintiff's counsel a letter explaining that the plaintiff

---

[18]Plaintiff's counsel spoke with Christopher Powers, a senior benefits review specialist (AR 65, see also AR 64).

was "entitled to one independent review of the decision to close his LTD claim" (AR 64).

For a review of the plaintiff's appeal, Standard obtained an additional medical review of the plaintiff (AR 500-507). Dr. Bradley Fancher on June 10, 2015, completed a report. According to the report, Dr. Fancher reviewed the plaintiff's voluminous medical records, which included records ranging from 2005 through 2014. Dr. Fancher thoroughly summarized the medical records (see AR 500-506). Dr. Fancher indicated that the plaintiff has various medical conditions, including myofascial pain syndrome, neck pain, thoracic back pain, lumbar pain, diabetes mellitus, and past testicular pain (AR 504, 506). Dr. Fancher opined the plaintiff would not be precluded from performing either light or sedentary work due to his diabetes, sleep apnea, or need "to use a restroom on an as-needed basis" (AR 504, 505-506).[19]

---

[19]Dr. Fancher, however, noted that in 2012, the plaintiff "would have been impaired for roughly seven days following his hospitalization" for an episode of diabetic ketoacidosis "to obtain better control of his diabetes" (AR 504).

Dr. Fancher indicated that the plaintiff was "reasonably impaired from performing any occupation from March 10, 2014, through April 16, 2014" due to having fallen and breaking at least one rib on March 10, 2014 (AR 506). However, Dr. Fancher concluded that the plaintiff would be able to resume to sedentary work after April 16, 2014 (id.).

In a letter dated June 24, 2015, Standard informed the plaintiff that it was upholding its previous decision denying his claim for long term disability benefits after December 25, 2007 (AR 57-62). Consequently, the plaintiff filed a complaint seeking relief from that decision.

II.

A.   The defendant filed its motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The plaintiff also filed a cross-motion for summary judgment. Rule 56(a), F.R.Civ.P., provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Material facts are those over which disputes "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Disputes about material facts are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. The movant bears the burden of establishing the absence of a dispute over material facts. Reynolds v. Bridgestone/Firestone, Inc., 989 F.2d 465, 469 (11th Cir. 1993).

In determining whether the moving party should be awarded summary judgment, the court must view the evidence and factual inferences therefrom in the light most favorable to the opposing party. Reynolds v. Bridgestone/Firestone, Inc., supra, 989 F.2d at 469. Any reasonable doubts about the facts are to be resolved in favor of the party opposing the motion for summary judgment. Id.

B.     An ERISA benefit plan participant may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. 1132(a)(1)(B). A plaintiff suing to recover benefits or enforce rights under ERISA bears the burden of proving his entitlement to benefits. Horton v. Reliance Standard Life Ins. Co., 141 F.3d 1038, 1040 (11th Cir. 1998). However, where an insurer claims that a specific policy exclusion applies to deny the insured benefits, the insurer generally must prove the exclusion prevents coverage. Id.

ERISA does not provide a standard for reviewing a benefits decision made by a plan administrator or fiduciary. Blankenship v. Metropolitan Life Ins. Co., 644 F.3d 1350, 1354 (11th Cir. 2011). Therefore,

based on guidance from the Supreme Court in Metropolitan Life Ins. Co. v.

Glenn, 554 U.S. 105 (2008) and Firestone Tire & Rubber Co. v. Bruch, 489

U.S. 101 (1989), the Eleventh Circuit has articulated a six-step analysis for

reviewing these decisions:

> (1) Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

> (2) If the administrator's decision in fact is "de novo wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

> (3) If the administrator's decision is "de novo wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

> (5) If there is no conflict, then end the inquiry and affirm the decision.

> (6) If there is a conflict, the conflict should merely be a factor for the court to take into account when

determining whether an administrator's decision
was arbitrary and capricious.

Blankenship v. Metropolitan Life Ins. Co., supra, 644 F.3d at 1355.

### III.

A.      As indicated, the Eleventh Circuit's framework requires

the court to decide first if the defendant's denial of the plaintiff's claim for

benefits was wrong.  See Blankenship v. Metropolitan Life Ins. Co., supra,

644 F.3d at 1355. To determine whether the defendant's decision was

"wrong" the Court must examine the terms of the Plan and the administrative

record to determine whether the Court agrees with the defendant's decision.

See Glazer v. Reliance Standard Life Ins. Co., 524 F.3d 1241, 1246 (11th Cir.

2008). Thus, no deference is afforded the administrator's decision.  Rather,

the Court is to "stand in the shoes of the administrator and start from scratch,

examining all the evidence before the administrator as if the issue had not

been decided previously." Stiltz v. Metropolitan Life Ins. Co., No. 1:05-CV-

3052, 2006 WL 2534406 at *6 (N.D.Ga. Aug. 30, 2006), aff'd, 244

Fed.Appx. 260 (11th Cir. 2007).

It is noted that the defendant does not appear to argue in its

motion for summary judgment that its decision was not wrong (see Doc. 20).

However, it is appropriate to start the analysis of this case from this point. Accordingly, I have reviewed the administrative record as if the case started from scratch and have determined that the defendant's decision was not wrong.

Thus, the defendant's determination that long term disability benefits were not payable based upon the policy's requirement that the plaintiff must be disabled from performing any occupation is not wrong. Notably, the plaintiff generally does not dispute the defendant's overview of the medical record, but does contend that there is medical evidence that the defendant improperly disregarded (Doc. 23). However, based upon my review of the undisputed medical evidence from the pertinent time frame, the plaintiff was not "unable to perform with reasonable continuity the Material Duties of Any Occupation" and, therefore, was not disabled (AR 17). Specifically, the uncontroverted medical opinions demonstrate that the plaintiff was not disabled from any occupation as of December 25, 2007. In this respect, the defendant had three different independent medical consultants review the medical record (and those reviews contained records

past the pertinent time frame), and each determined that the plaintiff was not disabled from "any occupation" (AR 504-506, 516-517, 524-525).

Specifically, Dr. Carlson completed an independent review of the medical record in June 2008 (AR 879-881). Dr. Carlson set forth the medical evidence that was before him including medical records from Dr. Bandyk, Dr. Merritt, Dr. Pichardo and Dr. Jakub. Dr. Carlson noted that "[t]he records ... are somewhat dated" (AR 879-880). Dr. Carlson explained that the plaintiff has had "low back pain, neck pain [and] testicular pain" (AR 879). Dr. Carlson stated that "[w]ith respect to the [plaintiff's] low back pain, [he] has minimal degenerative findings with history of chronic low back pain" (AR 880). Dr. Carlson opined that due to the plaintiff's "chronic low back pain ... [the plaintiff] would be precluded from medium-level work" (id.). However, Dr. Carlson indicated that the plaintiff's "limitations are likely permanent, [and] getting more updated records would be useful" (id.). Importantly, Dr. Carlson concluded that the plaintiff "would be capable of performing up to and including light-level work on a full-time basis" (id.).

Dr. Carlson, as part of the defendant's appeal process, completed another independent review of the medical record on December 18, 2014 (AR

523-525). Dr. Carlson set forth the updated medical records that were part of his review including records from Dr. Merritt, Dr. Allen, Dr. Reddy, Dr. Kattan, Dr. Wong, and Dr. Miranda (AR 523-524). Notably, many of these records pertain to a time period past 2007 (see id.). Dr. Carlson summarized the plaintiff's case as follows (AR 524):

> ...this is a 50-year-old sheet-rock applicator who ceased work September 26, 2005, with a history of chronic low back pain. These new records continue to describe chronic spine pain with ongoing treatment with medications and trigger-point injections and epidural steroid injections. The claimant also has multiple other medical conditions, including coronary artery disease, diabetes, and peripheral neuropathy, among other diagnoses.

With respect to the question of whether the plaintiff's "condition has improved, stayed the same, or worsened" since the doctor's last review of the plaintiff's medical record, Dr. Carlson answered (AR 525):

> These records suggest that the symptoms have been fairly chronic and ongoing. It does not appear that there is any new neurologic deficit such as radiculopathy, and overall, the spine condition appears to have stayed essentially the same.

Further, with regard to the question of whether "the limitations and restrictions identified in the prior review related to his back pain [are] still supported," Dr. Carlson answered (id.):

> In a 50-year-old individual with chronic spine pain of several years' duration with ongoing treatment, the prior limitations and restrictions are appropriate. He would remain precluded from medium-level work, but again, I would anticipate that he would be capable of sedentary or light-level work with further limitations and restrictions of no constant bending, stooping, twisting, or squatting activities.

Additionally, Dr. Carlson deferred to the opinion of an internal medicine doctor with respect to the plaintiff's foot numbness, diabetes, and cardiac complaints (id.).

In any event, Dr. Carlson opined that the plaintiff, as of December 2014, could perform sedentary work based on all of the medical documents before him. Accordingly, Dr. Carlson's opinion that the plaintiff could perform sedentary work in 2007 remained unchanged despite the availability of recent medical records.

Dr. Nudell, a doctor "Board Certified in Internal Medicine" completed an independent medical review on January 16, 2015, and

determined that the plaintiff would be capable of performing sedentary work (AR 511-517).  Dr. Nudell set forth the numerous medical records he reviewed ranging from 2005 through 2014 (AR 511-513).[20]  As previously indicated, Dr. Nudell spoke with the plaintiff's treating physician, Dr. Kattan, who did not give any specific recommendations regarding the plaintiff's restrictions or limitations (AR 513-514).

Dr. Nudell summarized his opinion as follows (AR 516):

> The [plaintiff] has a history of diabetes with reports of peripheral neuropathy; history of coronary artery disease status post stent placement; and history of chronic low back pain.... Based on review of the available documentation, from an internal medicine perspective only, the claimant should be limited to a sedentary based occupation with limitation of ambulation and ability to use a cane if needed.

With respect to the question of whether the plaintiff would have restrictions and limitations "due to his foot numbness, OM or cardiac complaints," Dr. Nudell answered (516-517):

> Based on review of the multitude of records including the podiatry and internal medicine records, I would opine that the [plaintiff] would not need complete removal from the workplace as a

---

[20]Dr. Nudell also considered records from 2015, but those appear to relate to the plaintiff's claim to disability benefits (see AR 511).

result of diabetes and diabetic neuropathy of the feet, but would be limited to a sedentary type occupation with the ability to use a cane as needed for ambulation. The [plaintiff] should therefore be capable of sitting for 6-8 hours out of an 8 hour day; ambulating for limited periods of time, up to 15 minutes at a time for 2 hours per day with the use of a cane; he should avoid kneeling, squatting, and balancing; the medical records do not support limitations with fine motor activity of the hands; the medical records do not support any cognitive restrictions or limitations based on these conditions. The [plaintiff] should be capable of lifting up to 10 pounds of weight frequently, with no restrictions with overhead lifting.

The [plaintiff] has been diagnosed with coronary artery disease, and underwent cardiac stent placement times 2 in October 2013. The available cardiac records document that the [plaintiff] was stable following this procedure, with echocardiogram revealing normal ejection fraction. There are no specific recommendations from the treating cardiologist for any specific work restrictions or limitations as a result of coronary artery disease. I would ultimately opine that the available records would not preclude the [plaintiff] from functioning in a sedentary based occupation as a result of coronary artery disease, and that the [plaintiff] should be capable of performing all of the above-mentioned functions from a cardiac perspective.

...

...The record documents a history of depression, without clear documentation that this condition would require specific functional restriction.... The

> [plaintiff] has been diagnosed with obstructive
> sleep apnea, without documentation that this
> condition would require specific functional
> restriction in the workplace.

Dr. Nudell further opined (AR 517):

> The [plaintiff] has a history of chronic diabetes and
> neuropathy. It appears that the [plaintiff] stopped
> working in September 2005 initially due to back
> pain. I am unable to determine specifically from
> the records as to when the [plaintiff's] neuropathy
> began; I can only comment that the [plaintiff's]
> diabetes and neuropathy appear to be a chronic
> condition, with at least mention of this condition in
> the records dating back to 2010.

Thus, Dr. Nudell, based on his review of the entire medical
record, including records up to and including 2014, determined that the
plaintiff could perform sedentary work. Indeed, Dr. Nudell spoke with the
plaintiff's treating physician, Dr. Kattan, who did not (according to Dr.
Nudell) identify specific limitations that the plaintiff required. Interestingly,
Dr. Nudell sent a letter to Dr. Kattan requesting that the doctor review Dr.
Nudell's synopsis of the conversation and requested that any changes be
made to it if needed (AR 518). Apparently, no response was given by Dr.
Kattan on the matter.

Thereafter, Dr. Fancher also conducted an independent medical review on June 10, 2015. Dr. Fancher set forth the extensive medical review he conducted (AR 500-504). With respect to the question of whether the plaintiff's diabetes, sleep apnea or the need to use the restroom on an as-needed basis from December 25, 2007, cause significant limitations and restrictions, Dr. Fancher answered (AR 504-505):

> The [plaintiff's] diabetes is being treated with several types of insulin as well as metformin. He has been noted by Dr. Kattan to have diabetic retinopathy; however, there are no opthalmology notes to review. It is not apparent from any of the medical records that we have to review that the [plaintiff] has any visual impairment. The [plaintiff] is noted to have decreased sensation to vibration in his feet, consistent with a diabetic neuropathy. The [plaintiff] would be capable of performing sedentary or light work with his diabetic neuropathy, though he may not tolerate standing more than 50% of the day with this condition. The [plaintiff] should be precluded from walking on uneven ground.
>
> The [plaintiff] was briefly admitted in 2012 for an episode of diabetic ketoacidosis, which occurred when he ran out of his insulin. The [plaintiff] would have been impaired for roughly seven days following his hospitalization to obtain better control of his diabetes.

The [plaintiff] is said to be on CPAP for sleep apnea. There are no polysomnograms to review. There is no indication in the medical record that the [plaintiff] has any trouble using CPAP. There is no indication that the [plaintiff] had excessive daytime somnolence. As such, there is no documentation in the records that we have to review that the [plaintiff] is impaired from being employed due to sleep apnea.

With respect to the question of whether there are any other medical conditions or combination of conditions that would prevent the plaintiff from performing sedentary work as of December 25, 2007, and continuing, Dr. Fancher indicated that the plaintiff could perform sedentary work (AR 505-506). Dr. Fancher gave a detailed answer to that question and some of his answer is as follows (id.):

The [plaintiff] has a long history of depression and is on citlopram. It is not apparent that the [plaintiff] is under the care of a mental health provider at this time. There are no detailed mental health notes to review. Although the [plaintiff] intermittently has been described as depressed in the medical records, I cannot identify any times where the [plaintiff] would have been impaired from his depression to an extent that it would have interfered with his occupational endeavors.

...

The [plaintiff] has an extensive history of extensive musculoskeletal complaints. His imaging studies have revealed relatively mild degrees of vertebral

spondylosis. There has been no documentation by any imaging study that the [plaintiff] has a nerve compression syndrome. The [plaintiff] has not been found to have any neurologic deficits in his extremities. The [plaintiff's] complaints from his musculoskeletal conditions seem to exceed the objective findings. The [plaintiff] uses a cane to walk, although the reason for this is unclear, as multiple examiners have found that the [plaintiff] has 5/5 strength in his lower extremities. The [plaintiff] has been noted to have an antalgic, or waddling, gait at times. Again, there is no explanation for this based on the [plaintiff's] neurologic findings and imaging studies.

Dr. Miranda has felt the [plaintiff] has fibromyalgia. Given the [plaintiff's] multiple tender points, I think this is a reasonable diagnosis. However, I note the [plaintiff] has pain with even light touch, which suggests some embellishment of his symptoms. The [plaintiff's] subjective symptoms with regard to his musculoskeletal complaints far exceed what could be anticipated based on his diagnoses and the objective findings. Considering the [plaintiff's] musculoskeletal complaints, and specifically considering the [plaintiff's] fibromyalgia, and his neck, thoracic back, and lumbar pain, I believe he had been capable of performing sedentary-level work from December 2007 to the present time.

...

The [plaintiff] has been said in some of the notes to have an inguinal hernia. Other notes suggest he has groin pain of uncertain etiology. Although the [plaintiff's] groin pain is not described in detail by any of the chart notes we have to review, it is not

apparent and cannot be expected that the [plaintiff's] groin pain/hernia would interfere with sedentary-level work.

The [plaintiff] has had testicular pain in the past, which has been attributed to epididymitis. His pain seems to be intermittent. I cannot identify any time periods where the [plaintiff] would have been impaired from being gainfully employed due to his testicular pain.

Other than the specific time periods mentioned above, I cannot identify other periods where the [plaintiff] would have been unable to perform sedentary work.

Based upon his review of the medical record, Dr. Fancher concluded that the

plaintiff was not disabled from December 25, 2007, until the present time.

Indeed, included in his decision were those medical records that were not

pertinent to the time frame around 2007 under the policy. Thus, even with the

addition of new medical records (post 2007) and the plaintiff's new medical

conditions, Dr. Fancher still concluded that the plaintiff was not disabled.

Thus, the plaintiff's medical records were reviewed by three

independent medical reviewers, and all opined that the plaintiff could perform

sedentary work. Notably, each doctor concluded that the defendant could

perform sedentary work as of December 25, 2007, through the time of their

reviews. In this respect, the Defendant's reliance on the independent medical reviewers' opinions that thoroughly reviewed the medical record demonstrates that its decision denying LTD benefits was not wrong. See Richey v. Hartford Life & Accident Ins. Co., 608 F.Supp.2d 1306, 1312 (M.D. Fla. 2009) ("An ERISA administrator is entitled to rely on the opinion of a qualified consultant who neither treats nor examines the claimant, but instead reviews the claimant's medical records."); see also, Garrett v. The Prudential Ins. Co. of America, 107 F.Supp.3d 1255, 1266 (M.D. Fla. 2015) (reliance on independent reviewers' assessments of medical record was not wrong). Moreover, my review of the administrative record aligns with the opinions of the independent medical reviewers.

Further, Gerry Goldsmith, a nurse, reviewed the medical records and completed a Nurse File Review on May 16, 2008 (AR 889-890). Goldsmith concluded that the restriction of the plaintiff lifting twenty pounds and the "ability to change positions every 2 [hours] as needed" was reasonable (AR 890). In this respect, a nurse's opinion may be considered in determining disability under ERISA. See Fick v. Metropolitan Life Insurance Co., 347 F.Supp.2d 1271, 1280 (S.D. Fla. 2004) (decision not wrong where

doctors and two nurse consultants conducted medical reviews and determined the plaintiff was no longer disabled); but, cf., Levinson v. Reliance Standard Life Insurance Co., 245 F.3d 1321, 1326-27 (11th Cir. 2001) (defendant's decision denying benefits was wrong where it relied on a nurse's review and an opinion of claim's person where there was no evidence contradicting treating physician's opinion that the plaintiff was disabled). Therefore, Goldsmith's review supports the defendant's decision to deny benefits.

My review of the administrative record correlates with the conclusions of the three independent reviewing doctors, as well as the nurse. There is no question that the plaintiff has various medical issues, and some of those issues have appeared to worsen over time. However, the question is not whether the plaintiff has a diagnosis of a medical ailment, but, whether he can perform any occupation as required under the plan. Corkill v. Hartford Life and Accident Insurance Co., 435 F.Supp.2d 1192, 1198 (N.D. Fla. 2005). Notably, the issue centers around whether the plaintiff can prove that he was disabled from any occupation in December 2007, thereby, qualifying for long term disability benefits. The plaintiff has not met this burden. Thus, the

overwhelming objective evidence demonstrates that the plaintiff is not disabled from any occupation.

In this respect, a reading of the defendant's policy demonstrates that objective evidence is required to prove a disability. Thus, the defendant's policy states a person is "[d]isabled from all occupations if, as a result of Physical Disease, Injury, Pregnancy or Mental Disorder, [he is] unable to perform with reasonable continuity the Material Duties of Any Occupation" (AR 17). A person must provide proof of loss, which means "written proof that [a person] [is] [d]isabled and entitled to LTD Benefits" (AR 28). Proof of loss also requires (id.):

> For claims of Disability due to conditions other than Mental Disorders, we may require proof of physical impairment that results from anatomical or physiological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.

Accordingly, subjective complaints of pain, although they may not be ignored in reviewing the evidence, will not, alone, demonstrate that a plaintiff is unable to perform work under the plan. See Giertz-Richardson v. Hartford Life and Accident Insurance Co., 536 F.Supp.2d 1280,1292 (M.D. Fla. 2008) (administrators "not required to automatically give significant

weight to all subjective complaints" because benefits would always be payable based on those complaints.); Watts v. Bellsouth Telecommunications, Inc., 218 Fed.Appx. 854, 857 (11th Cir. 2007) ("The requirement of objective evidence also promotes integrity by assuring there is corroboration for a claimant's subjective complaints, thus deterring embellished allegations of the effect of the diagnosed malady as well as deterring fraud in the claims process.") (internal quotation and citation omitted); Corkill v. Hartford Life and Accident Insurance Co., supra, 435 F.Supp.2d at 1198 ("Simply proving that [the plaintiff] is in some pain, treatable by pain medication, does not show that the pain is so debilitating that she is unable to function in any occupation."). Moreover, in order to be entitled to LTD benefits, the plaintiff was required to be "under the ongoing care of a [p]hysician in the appropriate speciality as determined by [Standard] during the Benefit Waiting Period" (AR 27). Thus, "[n]o LTD Benefits will be paid for any period of [d]isability when you are not under the ongoing care of a [p]hysician in the appropriate speciality as determined by us" (id.). Therefore, the medical records containing the plaintiff's subjective complaints of pain without correlating objective medical evidence do not support his claim. Consequently, the

plaintiff has failed to demonstrate that he was disabled from any occupation under the plan. Indeed, no doctor, other than Dr. Richard Merritt, a chiropractor, opined that the plaintiff was permanently disabled.

Moreover, the plaintiff's treating physicians' notes provide little support that he was disabled from any occupation. In particular, the administrative record contains treatment notes from Dr. Min from 2005 and 2006 (AR 1125-1131). Although largely not legible, the treatment notes appear to indicate Dr. Min was treating the plaintiff for testicular pain, back pain and hyperlipidemia (AR 1122, 1128, 1130). Notably, Dr. Min indicated on more than one occasion that the plaintiff could work. For example, in a treatment note, Dr. Min wrote that the plaintiff "needs letter to go back to work" (AR 1129).[21] Dr. Min also wrote on a prescription that the plaintiff "needs to do light work without lifting of any kind until further notice" (AR 900).[22] Dr. Min also completed a Family Health Centers Certificate to return to work/school form on October 19, 2005 (AR 903). That form indicated that the plaintiff could return to work on October 27, 2005, but that he could not

---

[21]The date of the treatment note is not included (AR 1129).

[22]The year of the prescription note is not legible (see AR 900).

do heavy lifting of twenty pounds, and he needed a 15 minute break for every two hours of work (id.). Thus, Dr. Min concluded that the plaintiff could return to work.

The administrative record contains treatment notes from Dr. Reddy that include the years 2006 through 2009 (see AR 822-860). However, the notes do not provide much guidance as they are largely routine treatment notes that are not legible (id.). Dr. Reddy noted the plaintiff had back pain and depression (AR 841, 851). On August 27, 2008, Dr. Reddy completed a form and indicated that the plaintiff has back pain, is unable to lift greater than twenty pounds, and his condition will last a "lifetime" (AR 896). Dr. Reddy did not provide any explanation for his opinion and it can be disregarded. Garrett v. The Prudential Insurance Co. of America, supra, 107 F.Supp.3d at 1266. In any event, a lifting restriction to twenty pounds would not render an individual disabled from sedentary work, or even light work.

Treatment notes from Dr. Pichardo indicate that the plaintiff was being treated for diabetes, epididymitis, back pain and testicular pain (AR 899, 910-914). However, Dr. Pichardo's notes mainly consist of the plaintiff's subjective complaints of pain regarding his back and groin area

(see AR 910, 912). In a conclusory prescription note on October 16, 2005, Dr. Pichardo wrote that the plaintiff needed to be excused "from work until 10/24/05 due to health issues," but did not indicate the health issues (AR 909). Thus, Dr. Pichardo provided no explanation for this conclusion. See Garrett v. The Prudential Insurance Co. of America, supra, 107 F.Supp.3d at 1266 (not wrong to give little or no weight to treating physicians' conclusory letters that also did not consider the plan's disability definition). Dr. Pichardo did not indicate in the note that the plaintiff could not work after October 2005.

Apart from the plaintiff's subjective complaints, the objective medical evidence in the record does not demonstrate that the plaintiff was under a disability precluding him from performing any occupation after his benefits ended in December 2007. According to Dr. Bandyk on November 21, 2005, a "[c]linical genital examination plus 2 ultrasounds found no testicular masses or acute problems ... there appears to be no clinical hernia" (AR 918, see also AR 924). He also opined, "I believe the [plaintiff] can return to work" (AR 918). Dr. Bandyk's opinion concerning the plaintiff had not changed a year later.

Surgical oncologist, Dr. Jakub, on November 21, 2005, explained that a CT scan was performed on the plaintiff's abdomen and pelvic areas on November 14, 2005 (AR 917). The results were "essentially negative with no pathology noted" (id.). Further, "[t]here [was] no ventral or spigelian hernia," "no defect in the intraabdominal wall," and "no inguinal hernias" (id.). Dr. Jakub concluded that regarding the plaintiff's testicular pain there is "no radiographic evidence to identify his pain" and that he was "not clear on the etiology of this pain" (id.). Dr. Jakub opined that there was "no surgical intervention required" (id.).

The evidence from the plaintiff's treating chiropractors, Drs. Merritts, lend some support for the plaintiff's claim of disability, but the records are not conclusive. Thus, the medical records from both Drs. Merritts, are generally repetitive and are largely based on the plaintiff's subjective complaints of pain (see e.g., AR 944-976, 1210-1220). Therefore, while these records show the plaintiff has pain, the relevant determination is whether the administrative record supports that he has "medically-determinable impairments which preclude him from engaging in any compensable employment" that he is qualified to perform. Gordon v. Federal

Express Corp., No. 2:11-CV-576, 2014 U.S. Dist. Lexis 102488 *35-36 (M.D. Fla., April 28, 2014).  Consequently, despite the presence of some medical records supporting the plaintiff's claim for disability, overall, these medical records do not support that he was disabled from any occupation.

It is noted that on October 12, 2005, an unknown health care provider completed a Certification of Health Care Provider (Physician certification for leave of absence under FLMA) and indicated that the plaintiff was unable to work as of September 26, 2005 (AR 901).  The duration was to last only for three weeks and indicated only that the treatment was medication for the pain (AR 901, 902).

Moreover, other treatment notes from the chiropractors do not support a disabling condition.  Thus, during the chiropractic treatments, the plaintiff was noted to have normal ambulation and a symmetrical gait at various visits including, January 2006, February 2006, and in December 2006 (AR 1168, 1170, 1176).  Dr. Richard Merritt completed a Discharge Report on May 10, 2006, containing conflicting and conclusory statements. First, he noted that the plaintiff was being discharged from his office's care "because a maximum level of clinical improvement has been obtained" and that his

"prognosis in this case must be considered poor" (AR 1493, 1494). Dr.

Merritt stated that the plaintiff should do low impact aerobics, but, also stated

(1494):

> This patient is presently capable of safely
> performing sedentary daily activities which include
> exerting up to ten pounds of force to lift/push/pull
> up to one-third of the time and/or negligible
> amounts frequently; sitting most of the time with
> brief periods of walking or standing up to one-third
> of the time. He is incapable of safely working.

Further, the plaintiff was not referred for a medical consultation, although Dr.

Merritt opined the plaintiff "sustained a permanent, partial disability

conservatively related as six percent of the body as a whole" under the

"Florida Impairment Guide" (1494, 1495). Moreover, Dr. Merritt did not

provide an explanation for this prognosis. Instead, Dr. Merritt stated that the

plaintiff should have "[a] physical capacity evaluation and vocational

rehabilitation" but, that "he may prove to be a more viable candidate for

Social Security Disability" (AR 1495).

In addition, the objective evidence of an MRI and an x-ray of the

plaintiff's spine in November and December 2005, did not show a significant

injury (AR 1524, 1525). Thus, Dr. Pichardo referred the plaintiff for an MRI

of his lumbar spine which was completed on November 28, 2005 (see AR

1524).  The interpretation of the MRI was (id.):

> No abnormal vertebral body signal with no significant desiccation of the intervertebral discs.
>
> L2-L3: Mild ligamentum flavum hypertrophy, no spinal canal stenosis.  Patent neural foramen.
>
> L2-L3, L3-L4:  Mild  ligamentum  flavum hypertrophy,  no  spinal  canal  stenosis.   Patent neural foramen.
>
> L5-S1: No spinal canal stenosis.  Patent neural foramen.

The impression was "[n]o significant spinal canal stenosis with patent neural

foramen" (id.).[23]

Dr. Miranda, a neurologist, also examined the plaintiff in June

2006, noting he exhibited "quite a bit of pain behavior" (AR 907).  Dr.

Miranda diagnosed him with cervicalgia, "some testicular pain, possibility of

epididymitis or orchialgia," and pelvic pain (id.).  Dr. Miranda did not

---

[23]An MRI of the plaintiff's lumbar spine on April 14, 2010 (although out of the pertinent time frame), showed his lumbar spine had not changed years later (AR 1039). The impression of the MRI was "[n]ormal MRI of the lumbar spine" (id.).  The results of an MRI of the plaintiff's lumbar spine on September 23, 2013, was essentially normal (AR 1352).  The impression was "[v]ery mild lateral recess stenosis at L4-5" (id.).

indicate whether the plaintiff was disabled, but recommended physical therapy (id.).

As indicated, no doctor recommended that the plaintiff undergo surgery for any of his pain symptoms in his neck, back, or groin area, which indicates that the plaintiff's condition is not as debilitating as alleged. Notably, three medical doctors reviewed the plaintiff's medical records (including the records from his chiropractors) and each determined that the plaintiff's various conditions did not prevent him from being able to work at any occupation. See Fick v. Metropolitan Life Ins. Co., supra, 347 F.Supp.2d at 1281 (looking at the quality of opinions "medical doctor versus a chiropractor, and the potential for bias..."). In this respect, no special deference is given to the opinions of a plaintiff's treating doctors. The Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003); Watts v. Bellsouth Telecommunications, Inc., supra, 218 Fed.Appx. at 857; Sejdic v. Group Long-Term Disability Plan For Employees Of Homeside Lending, Inc., 348 F.Supp.2d 1313, 1319 (M.D. Fla. 2004). Accordingly, I have accepted the opinions of the independent medical reviewers over the treating chiropractors' opinions.

Significantly, the plaintiff has not identified any opinions from medical doctors indicating that he cannot perform sedentary work. <u>See</u> <u>Ascher</u> v. <u>Mayo Clinic</u>, No. 3:12-CV-20, 2013 U.S. Dist. Lexis 49017 *16 (M.D. Fla., January 23, 2013) (granting summary judgment where the plaintiff did not "offer any medical opinion or records that established a total disability or addressed her inability to perform [her] job duties"). Rather, as discussed later, he unsuccessfully argues that his non-exertional impairments prevent him from working. However, as explained, the plaintiff's subjective complaints alone do not demonstrate that he is totally disabled under the policy as they are unsupported by objective medical evidence in the record demonstrating functional limitations. <u>See</u> <u>Gordon</u> v. <u>Federal Express Corp.</u>, <u>supra</u>, 2014 U.S. Dist. Lexis 102488 at *32 (lack of largely corroborating objective medical evidence did not support the plaintiff's self-reported subjective complaints demonstrating a total disability under the policy).

In sum, based upon my review of the medical record, the defendant's decision denying long term disability benefits was not wrong.

B.    Because the defendant's decision was not wrong, there is no requirement that the case be analyzed further. <u>Glazer</u> v. <u>Reliance Standard</u>

Life Insurance Co., 524 F.3d 1241, 1247 (11th Cir. 2008).  However, even assuming that the defendant's decision was wrong, its decision was reasonable under the circumstances and, therefore, the defendant is entitled to summary judgment.

As indicated, the thrust of the defendant's argument is that its decision was reasonable (Doc. 20, pp. 19-24).  The defendant is referring to step three of the analysis for ERISA claims, which directs that, if an administrator's decision is "de novo wrong," and it was vested with discretion in reviewing claims, the court determines whether "reasonable" grounds supported the decision (hence, review the decision under the more deferential arbitrary and capricious standard).  Blankenship v. Metropolitan Life Ins. Co., supra, 644 F.3d at 1355.

In this case, the plaintiff does not dispute that the defendant had discretionary authority in making decisions on claims for disability benefits (Doc. 20, p. 19; see Doc. 23).  Accordingly, the defendant's denial of long-term benefits must satisfy the "arbitrary and capricious" standard of review.

"When conducting a review of an ERISA benefits denial under an arbitrary and capricious standard (sometimes used interchangeably with an abuse of discretion standard), the function of the court is to determine whether there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made." Jett v. Blue Cross and Blue Shield of Ala., Inc., 890 F.2d 1137, 1139 (11th Cir. 1989). If there is a reasonable basis, the decision "must be upheld as not being arbitrary or capricious, even if there is evidence that would support a contrary decision," White v. The Coca-Cola Co., 542 F.3d 848, 856 (11th Cir. 2008), cert. denied, 556 U.S. 1166 (2009) (internal citation and quotation omitted), or "[if] the court or anyone else might reach a different conclusion." Turner v. Delta Family-Care Disability and Survivorship Plan, 291 F.3d 1270, 1274 (11th Cir. 2002). Similarly, if the "evidence is close," the administrator did not abuse its discretion, and the requisite deference compels the affirmance of the administrator's decision. See Doyle v. Liberty Life Assur. Co. of Boston, 542 F.3d 1352, 1363 (11th Cir. 2008).

The reasons that the defendant's decision was not wrong show that the defendant's decision was clearly reasonable. See Ascher v. Mayo

<u>Clinic</u>, <u>supra</u>, 2013 U.S. Dist. Lexis 49017 at *20-21 (court determining decision under policy was not *de novo* wrong, decision was also reasonable where medical record did not support total disability under the policy).

The plaintiff argues that the defendant's decision was not reasonable because it did not take into consideration his various ailments that largely relate to his subjective complaints (<u>see</u> Doc 23, pp. 6-7). The plaintiff asserts that the defendant did not consider his complaints of "shortness of breath, fatigue, abdominal pain, depression, blurred vision, frequent urination, memory loss or confusion, swollen glands in neck, weakness in muscles or joints, frequent or recurring headaches, and excessive thirst or urination" (<u>id.</u>, p. 6). This argument is meritless for various reasons.

First, the plaintiff's citations within his argument relate to the plaintiff's subjective complaints regarding his ailments (<u>see</u> Doc. 23, pp. 6-7). However, as previously explained, the defendant's policy required objective medical evidence. Therefore, it was not unreasonable for the defendant to give less weight to the plaintiff's subjective complaints. In other words, it was not unreasonable for the defendant to deny benefits based upon accepting

the objective evidence and opinions of three medical doctors that reviewed

the medical records, over the plaintiff's subjective complaints.

As the defendant correctly counters, no medical doctor opined

that the plaintiff could not perform sedentary work during the pertinent time

frame in December 2007 or before (Doc. 27, p. 7). Only Dr. Merritt, the

plaintiff's chiropractor, indicated that the plaintiff was disabled. However,

no specialist, like an orthopaedist, urologist, or neurologist opined that the

plaintiff could not work. Indeed, the plaintiff's citation to medical records

long after the pertinent time frame of 2007 provide no support that he could

not perform work in 2007. See Muzyka v. Unum Life Insurance Co. Of

America, 195 Fed.Appx. 904, 910 (11th Cir. 2006) (the "relevant inquiry" was

whether the plaintiff was disabled from any occupation as of the date that the

disability ended for being disabled under any occupation under the policy);

Sobh v. Hartford Life and Accident Insurance Co., 658 Fed.Appx. 459 (11th

Cir. 2016) (the fact that the plaintiff was disabled after termination of benefits

does not alter the conclusion that his benefits were properly terminated at a

time he was determined to be able to perform sedentary work).

Further, the plaintiff's citation to the medical record regarding his blood sugar levels for his diabetes does not demonstrate that he was disabled from any occupation. A diagnosis is not sufficient to determine a disability because the plaintiff must establish that he is unable to work. Howard v. Hartford Life & Acc. Ins. Co., 929 F.Supp.2d 1264, 1294 (M.D. Fla. 2013); Garrett v. The Prudential Ins. Co. of America, supra, 107 F.Supp.3d at 1267.

Moreover, subjective complaints do not become objective evidence merely because a doctor has written them down. Howard v. Hartford Life & Acc. Ins. Co., supra, 929 F.Supp.2d at 1295; Garrett v. The Prudential Ins. Co. of America, supra, 107 F.Supp.3d at 1266-1267. Thus, "ERISA disability is not established merely by the existence of pain, even chronic pain, in the absence of proof that the claimant's pain actually precludes him or her from working." Richey v. Hartford Life & Accident Ins. Co., supra, 608 F.Supp.2d at 1310; see also Hufford v. Harris Corp., 322 F.Supp.2d 1345, 1355 (M.D. Fla. 2004) (if a plan administrator could not reject a claim based on subjective complaints, a claim could never be denied and would allow fraudulent claims to be treated the same as claims based on

objective medical evidence).   The lack of objective medical evidence demonstrates that it was reasonable for the defendant to conclude that the plaintiff was not disabled from performing any occupation.   Howard v. Hartford Life & Acc. Ins. Co., supra, 929 F.Supp.2d at 1295 (considering the various negative test results reported despite the plaintiff's subjective complaints indicated the plaintiff was not disabled from performing her sedentary work).

The defendant correctly argues that the plaintiff cites to inapposite case law from the Ninth Circuit in support of his argument that the defendant ignored his subjective complaints of pain (Doc. 27, pp. 9-10).  The plaintiff misstates the holding in Montour v. Hartford Life & Accident Insurance Co., 588 F.3d 623 (9th Cir. 2009).  The plaintiff asserts that the court in Montour held that "it was error to require objective medical evidence of complaints that are inherently subjective in nature" (Doc. 23, p. 6).  That case simply does not stand for that proposition.  Montour v. Hartford Life & Accident Insurance Co., supra, 588 F.3d at 635.

Similarly, the plaintiff's reliance on Salmoaa v. Honda Long Term Disability Plan, 642 F.3d 666 (9th Cir. 2011), is misplaced.  In Salmoaa,

the court reversed and remanded a case involving a denial of benefits for a plaintiff who had chronic fatigue syndrome. The court partly based its reasoning on the factor that the "plan administrator demanded objective tests to establish the existence of a condition for which there are no objective tests" and every doctor that examined the plaintiff concluded that he was disabled. Salmoaa v. Honda Long Term Disability Plan, supra, 642 F.3d at 676.

The defendant cogently responds that the facts of Salmoaa are not analogous to the facts of this case (Doc. 27, pp. 10-11). Here, the plaintiff did not base his claim of disability benefits on a condition like chronic fatigue syndrome for which no objective evidence is available. The plaintiff, instead, based his disability on problems regarding his back and groin area. As previously explained, the defendant did not deny the plaintiff's claims because it was based solely on his subjective complaints. Rather, the defendant predicated its decision on various independent medical reviewers that concluded the plaintiff could perform sedentary work. Further, the objective evidence pertaining to MRIs and x-rays simply did not support the plaintiff's subjective complaints of pain. Therefore, the plaintiff's argument is meritless.

Further, the plaintiff's argument relating to his headaches and resulting lack of cognitive functioning is also baseless (Doc. 23, pp. 6-7). Thus, the plaintiff submits that the "[d]efendant did not discuss [his] headaches in terms of its impact on his ability to focus and concentrate on work related activities" (id., p. 6). The plaintiff provides no objective evidence from the pertinent time frame that he lacked an ability to concentrate or had decreased cognitive functioning due to headaches (id., pp. 6-7).[24] Thus, no doctor opined that the plaintiff lacked cognitive functioning in 2007 resulting in an ability to perform sedentary work. Further, the plaintiff did not receive medical treatment for any sort of cognitive problems during the pertinent time frame and he did not have any tests done demonstrating that he lacked cognitive functioning.

Indeed, the plaintiff has not cited to any evidence from the pertinent time frame, demonstrating a lack of cognition. Rather, the records demonstrate the opposite. For example, on January 10, 2006, the plaintiff's

---

[24]The plaintiff was evaluated by neurologist Dr. Shailesh Rajguru on August 17, 2011 (AR 1034-1036). Dr. Rajguru opined that the plaintiff has "[c]ognitive dysfunction with subjective decline over the last approximate five years" (AR 1035). First, this examination was completed years after 2007 and is clearly not within the pertinent time frame. Morever, Dr. Rajguru did not perform any tests on the plaintiff five years prior, and, therefore, his conclusion that the plaintiff began a mental decline five years previously is questionable.

chiropractor marked on the form "yes" that the plaintiff had a good mood/affect and was orientated in time, person, and place (AR 1168). Later on June 23, 2006, Dr. Miranda indicated that the plaintiff had no memory impairments (AR 906). Therefore, there is simply a lack of evidence that the plaintiff had a decrease in cognitive functioning in 2007.

Similarly, the plaintiff asserts that the defendant did not take into consideration his urinary frequency due to his diabetes. This argument is meritless. The plaintiff has not cited evidence in his argument that his urinary frequency impaired him from performing sedentary work (see Doc. 23, p. 7).

Instead of citing evidence, the plaintiff merely attempts to make something out of a question answered by Dr. Fancher in his independent review. Dr. Fancher was asked (AR 504):

> Does the medical information in the file support significant limitations or restrictions from diabetes, sleep apnea, or the treatment of these conditions to be so severe as to interfere with the [plaintiff's] ability to work in a setting with the ability to use a restroom on an as-needed basis as of December 25, 2007, and continuing?

Dr. Fancher answered the question in the negative.

The plaintiff asserts that "[t]here is an implication that the Defendant accepted the fact that the [p]laintiff would need to use the restroom on an as needed basis" (Doc. 23, p. 7). The inclusion of an assumption regarding use of a bathroom does not mean that the defendant agreed that the plaintiff suffered from urinary frequency. The plaintiff's reliance upon the purported implication of the question does not substitute for evidence of urinary frequency.

Furthermore, there is nothing in the question that quantifies the plaintiff's urinary frequency. Seemingly, every employee would have to use the restroom on an "as-needed" basis. The plaintiff's reliance on such a strained contention underscores the weakness of the plaintiff's challenge to the defendant's determination.

In sum, the defendant had three opinions from doctors that independently reviewed the medical record (which included the plaintiff's subjective complaints of pain to his doctors) and determined, contrary to the plaintiff's chiropractors, that the plaintiff could perform sedentary work. Further, the objective evidence does not support the plaintiff's complaints of pain. Thus, in light of the overwhelming evidence that the plaintiff could

perform sedentary work, it was reasonable for the defendant to conclude that the plaintiff was not entitled to benefits under the any occupation provision.

Notably, the defendant allowed the plaintiff to submit additional records years after 2007 in order to give him an opportunity to prove that he could not perform the material duties of any employment. However, the plaintiff did not meet his burden by submitting medical documentation showing that he had functional limitations due to his medical conditions to qualify as having a total disability from any occupation. Gordon v. Federal Express Corp., supra, 2014 U.S. Dist. Lexis 102488 at *50.

C.   Conflict of Interest

The next step of the analysis examines whether the defendant operated under a conflict of interest. Blankenship v. Metropolitan Life Ins. Co., supra, 644 F.3d at 1355. The defendant acknowledges that it "operates under a structural conflict of interest" because it is both the insurer and the decisionmaker (Doc. 20, pp. 2-3, 19; AR 30). The Eleventh Circuit cautions, however, that even where a conflict of interest exists, courts still owe deference to the plan administrator's discretionary decision-making as a whole. Blankenship v. Metropolitan Life Ins. Co., supra, 644 F.3d at 1355.

There is no basis to conclude that the conflict of interest is a significant factor in this case, as the defendant provided a reasonable explanation for its decision, and there is no evidence that the defendant's decision was altered due to a conflict of interest. The defendant's retention of three independent medical experts and a nurse reviewer further minimizes any concern that the decision was altered due to the conflict of interest. Therefore, the structural conflict of interest does not render the defendant's decision unreasonable. See Echols v. Bellsouth Telecommunications, Inc., 385 Fed.Appx. 959, 961 (11th Cir. 2010) ("[G]iven the eminent reasonableness of the decision, the lack of evidence that any assumed conflict influenced the claims decision indicates that any assumed conflict should be given little weight in judging whether the decision was an abuse of discretion.").

Moreover, the defendant has submitted a declaration of a benefits reviewer that sets out the circumstances indicating that the reviewers would have no significant incentive to decide in favor of the defendant (Doc. 20, p. 2 n.2; Doc. 20-1, Ex. A). Those circumstances would mitigate any potential conflict of interest.

Finally, the plaintiff has not made any meaningful argument that a conflict of interest existed.

For these reasons, the issue of conflict of interest does not significantly affect the issue whether the administrative decision was reasonable.

D.    Vocational Evidence

The plaintiff argues that the evidence by a vocational consultant regarding the plaintiff's ability to work is flawed and, therefore, the defendant erred in relying upon the information in concluding that the plaintiff was not disabled from any occupation.  The plaintiff's arguments are baseless.

First, the plaintiff argues that ERISA cases are analogous to Social Security cases and, therefore, the defendant's expert did not follow a proper format by considering all of the plaintiff's impairments.  Notably, the plaintiff did not cite authority for this proposition (see Doc. 23, pp. 7-9).

"Social Security decisions are not binding on ERISA plan administrators, and are just one factor to consider in evaluating an ERISA disability determination." MacDonald v. Anthem Life Insurance Co., No. 8:12-CV-2473, 2014 U.S. Dist. Lexis 136853 *40 (M.D. Fla., September 26,

2014); see also, Paramore v. Delta Air Lines Inc., 129 F.3d 1446, 1452 n.5 (11th Cir. 1997). Moreover, the definition of a disability under Social Security criteria based on federal law differs from ERISA disability as defined under a policy plan. See The Black and Decker Disability Plan v. Nord, supra, 538 U.S. at 833; MacDonald v. Anthem Life Insurance Co., supra, 2014 U.S. Dist. Lexis 136853 at *40-41.

It is important to note, as the defendant asserts, that the plaintiff was not granted Social Security disability benefits until 2009, over eighteen months after his coverage under the policy ceased (Doc. 20, p. 22).[25] Consequently, any grant of Social Security disability benefits past the pertinent time frame has little, if any, bearing in this matter. Curran v. Kemper National Services, Inc., No. 04-14097, 2005 WL 894840 *8 (11th Cir., March 16, 2005); see also Sobh v. Hartford Life and Accident Insurance Co., supra, 658 Fed.Appx. at 459 (award of Social Security benefits "over two years earlier [from termination of benefits] is of little consequence").

---

[25]In a letter dated March 2, 2012, plaintiff's counsel sent the defendant a letter and stated that the plaintiff "was granted Social Security Disability Insurance Benefits effective July, 2009" (AR 155).

The plaintiff further argues, citing to Social Security disability benefits case law, that the defendant erred because it relied on a vocational consultant's opinion that did not include all of the plaintiff's impairments. As indicated, the definition of disability under the policy differs from Social Security law. Accordingly, the plaintiff's argument citing Social Security cases is inapposite.

Moreover, the plaintiff argues that the defendant's vocational consultant did not consider his impairments regarding the ability to use a restroom and an independent reviewer's opinion that the plaintiff could only ambulate every 15 minutes (Doc. 23, pp. 8-9; see also, Doc. 28, p. 2). Obtaining vocational evidence is not required in determining that a plaintiff is disabled from any occupation. MacDonald v. Anthem Life Insurance Co., supra, 2014 U.S. Dist. Lexis 136853 at *43; Richey v. Hartford Life & Accident Ins. Co., supra, 608 F.Supp.2d 1306 at 1312 (obtaining vocational evidence to compare with medical evidence is effective, but not required in reaching an informed decision). Therefore, the defendant was not required to obtain vocational expert evidence and, the fact that it did supports the position that the defendant's determination was reasonable.

This circumstance presents a sharp contrast to Social Security law. In Social Security cases, if the issue is whether the claimant can perform jobs that exist in significant numbers in the national economy (step five of the sequential analysis), the burden shifts to the Commissioner of Social Security to make such a showing, which is ordinarily done through the testimony of a vocational expert. Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999), cert. denied, 529 U.S. 1089 (2000). That substantial difference in adducing evidence renders misplaced the plaintiff's reliance on Social Security cases.

Valerie Gibson, on January 28, 2015, completed a Transferable Skills Assessment And Any Occupation Review for the LTD Decision (AR 293-307). Based on the plaintiff's past work, training, and the ability to do sedentary work, Gibson determined that the plaintiff could work as a customer service representative and information clerk (AR 297, 298).

As previously explained, the plaintiff's attempts at challenging the defendant's decision based on bathroom use was already discussed and determined to be meritless since there was no evidence of urinary frequency. Consequently, the hypothetical question to Gibson did not need to include such a factor.

Moreover, the plaintiff argues that the vocational consultant did not consider Dr. Nudell's statement that "[he] could only ambulate for [fifteen] minutes at a time" (Doc. 23, p. 8). The plaintiff does not fully state the opinion from Dr. Nudell. Dr. Nudell opined that the plaintiff would be "capable of sitting for 6-8 hours out of an 8 hour day; ambulating for limited periods of time, up to 15 minutes at a time for 2 hours per day with the use of a cane" (AR 516). Dr. Nudell also stated that the plaintiff "should be limited to a sedentary based occupation with limitation of ambulation and ability to use a cane if needed" (id.). Therefore, Dr. Nudell's opinion does not support the plaintiff's argument that he could not work.

Interestingly, the plaintiff has not pointed to evidence from 2007 that he was required to use a cane or that one was prescribed. Dr. Fancher noted that the plaintiff uses a cane (AR 501, 503). However, some of that observation related to the plaintiff's treating doctor's notes from 2014 (AR 503). Therefore, the use of a cane years later has no bearing during the pertinent time frame of 2007. Indeed, Dr. Fancher stated that the plaintiff "uses a cane to walk, although the reason for this is unclear, as multiple examiners have found that the [plaintiff] has 5/5 strength in his lower

extremities" (AR 506).  Regardless, despite the use of a cane, three medical

doctors opined that the plaintiff could perform sedentary work.

In all events, the vocational consultant specifically indicated that

both jobs of a customer service representative and information clerk are

sedentary and would allow the plaintiff "the ability to ambulate with the use

of a cane, as needed" (AR 297, 298).  Consequently, the decision is not

flawed due to inadequate vocational information.

The plaintiff also argues that Gibson used the incorrect year of

2013 in determining the plaintiff's earning capability required under the plan,

rather than the correct time frame of December 2007 (Doc. 23, p. 9).  The

defendant's policy provides to be disabled from any occupation (AR 17):

> ....means any occupation or employment which you
> are able to perform, whether due to education,
> training, or experience, which is available at one or
> more locations in the national economy and in
> which you can be expected to earn at least 60% of
> your Indexed Predisability Earnings within twelve
> months following your return to work, regardless
> of whether you are working in that or any other
> occupation.

The defendant submitted a Declaration from Gibson in which she

explained she utilized the median income from the year 2013 for the listed

jobs because she normally relies on current information in preparing her reports (Doc. 27-1, p. 1). She also stated she investigated further and determined that the plaintiff would be able to meet the required median income for the listed jobs in 2007 (id., p. 2).[26] Therefore, according to Gibson's corrected median income for the identified jobs, the plaintiff would still be able to earn the required median income to disqualify him from receiving long term disability benefits.

The plaintiff also argues that Gibson erred because she clustered the jobs of information and reception clerks into one category in determining the median income, but she did not identify the median income for the particular jobs she identified (Doc. 23, p. 10). The plaintiff makes the same argument regarding the customer service employment and that not all customer service jobs are the same (id.).

The plaintiff's argument is meritless. First, he does not submit any contrary evidence showing that Gibson's assessment of the plaintiff's

---

[26]Gibson explains that she contacted the United States Bureau of Labor Statistics - Economic Analysis and Information - Western Region Office to gather the information for the earnings rate for 2007 (Doc. 27-1, p. 2). She was advised by a statistician that the median wage for a receptionist and information clerk was $11.16 per hour and for the customer service representative it was $13.68 per hour (id.).

earning capacity is wrong (see Doc. 23, p. 10). In other words, he did not submit evidence that the earning capacity for a particular job was below the threshold amount. As indicated, it is the plaintiff's burden under the policy to show that he is disabled from any occupation. Accordingly, if he contends that the jobs identified by Gibson do not provide the minimum income required by the policy, then it was his burden to make such a showing. He made no attempt to do so. Doyle v. Liberty Life Assur. Co. of Boston, supra, 542 F.3d at 1362.

Moreover, Gibson corrected her mistake and contacted a statistician from United States Bureau of Labor Statistics - Economic Analysis and Information - Western Region Office regarding the matter.[27] She was informed by the statistician and he advised her about the median income levels for those categories of jobs for 2007 (Doc. 27-1, p. 2). Regardless, the defendant's reliance on incorrect information does not render its decision arbitrary and capricious. See Moeller v. Guardian Life Insurance Co. Of America, No. 5:10-CV-457, 2011 WL 7981954 *10 (M.D. Fla.,

---

[27]The Bureau of Labor Statistics is part of the United States Department of Labor (see https://www.bls.gov/).

December 16, 2011) (defendant's reliance on incorrect geographic evidence for jobs in vocational evidence did not render the decision arbitrary and capricious).

The plaintiff makes the contention that the defendant cannot add the evidence of Gibson's Declaration because it was not part of the administrative record at the time of the defendant's decision (Doc. 28, pp. 3-4). Thus, the plaintiff argues that the defendant cannot make post hoc rationalizations for its decision (see id.).

It is true that the Declaration was not part of the administrative decision, but Gibson's initial report was, and the defendant considered her report along with the other information in the record in reaching its conclusion that the defendant did not qualify for long term disability benefits. In other words, the defendant is not offering a new and different reason for its decision but, rather, is countering the plaintiff's argument to explain that even with the new information concerning wages for 2007, it would have still reached the same conclusion. Thus, it would make no sense to remand this matter, as the plaintiff requests, in order to correct the alleged error, since the result would not change.

The plaintiff argues that the defendant did not take into consideration that he would require training to do certain jobs (Doc. 23, pp. 11-12). He further asserts that his previous employment as a cashier at Disney World is an unskilled job and does not have transferrable skills (id.). The defendant correctly counters that the plaintiff, again, attempts to shift the burden to the defendant to demonstrate that he is unable to perform sedentary work (Doc. 27, p. 17).

In this respect, there is nothing to suggest in the plaintiff's argument that a plaintiff with his training and degree could not work in the identified jobs. The possibility that the plaintiff may have to undergo some training in order to work at the identified jobs does not eliminate those jobs. Lamb v. Hartford Life And Accident Insurance Co., 862 F.Supp.2d 1342, 1351 (M.D. Ga. 2012). Indeed, any job in any category always involves some type of training. The plan specifically contemplates training as it says a person must be able to earn sixty percent of his earnings within "twelve months following your return to work" (emphasis added) (AR 17). Based on the plaintiff's argument, a job requiring any type of training would automatically disqualify that job and, therefore, a plaintiff would

automatically be considered disabled under the plan. This interpretation would leave the "any occupation" definition pointless and cannot be the requirement. Thus, as previously explained, the pertinent inquiry is whether, despite the defendant's diagnoses, he could perform sedentary work. Nothing in the medical record shows he could not do so.

<div align="center">V.</div>

For the foregoing reasons, the defendant is entitled to summary judgment. I therefore recommend that the Defendant's Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. 20) be granted, and the Plaintiff's Cross Motion for Summary Judgment with Memorandum of Law (Doc. 23) be denied.

Respectfully submitted,

THOMAS G. WILSON
UNITED STATES MAGISTRATE JUDGE

DATED: JANUARY 24, 2017

## NOTICE TO PARTIES

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. 11th Cir. R. 3-1.